

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ARTIS BAINES,

      Plaintiff,

v.

      Civil Action No. **3:14CV616**

C. HICKS, *et al.*,

      Defendants.

## MEMORANDUM OPINION

      Artis Baines, a Virginia inmate proceeding *pro se*, brings this 42 U.S.C. § 1983[1] action

alleging that Defendants[2] violated his First Amendment free exercise rights,[3] his Fourteenth

Amendment equal protection rights,[4] his due process rights,[5] his rights under the Religious Land

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects,
> or causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law . . . .

42 U.S.C. § 1983.

[2] Baines names the following Defendants: (1) C. Hicks, Assistant Food Operations Director at Greensville Correctional Center ("GCC"); (2) Kathryn Whitehead, Wage Food Operations Supervisor at GCC; (3) Anthony Anderson, Food Operations Director Senior at GCC; (4) Rodney T. Garrett, former Unit Head Manager of Building 6 at GCC; (5) Carolyn M. Parker, Assistant Warden at GCC; (6) Mark Engelke, Director of Food Services at the Virginia Department of Corrections ("VDOC"); (7) Natarcha Gregg, Registered Dietician of the VDOC; and, (8) Harold W. Clarke, Director of the VDOC. (*See* Final Compl. ¶¶ 2–8, ECF No. 72; Answer 3–4, ECF No. 79.)

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Use and Institutionalized Persons Act ("RLUIPA"), and breached a contract.[6] The action proceeds on the Final Particularized Complaint. ("Final Complaint," ECF No. 72.)[7] Defendants have filed a Motion for Summary Judgment. (ECF No. 80.) For the reasons set forth below, the Court will GRANT Defendants' Motion for Summary Judgment.

## I.   THE ROAD TO THE FINAL COMPLAINT

Baines has filed numerous complaints during the pendency of this action. With each new submission, his legal claims and the supporting facts have shifted, and the defendants have changed. On September 4, 2014, Baines filed his initial Complaint. (ECF No. 1.) Baines subsequently filed improper amended pleadings in January 2015, March 2015, and on May 21, 2015. (ECF Nos. 18, 21, 25.) After reviewing the Supplemental Complaint, by Memorandum Order entered on September 14, 2015, the Court directed Baines to file a particularized complaint. (ECF No. 34.) On October 19, 2015, Plaintiff filed a Particularized Complaint. (ECF No. 38.) In the Particularized Complaint, Baines raised the following claim:

> Plaintiff alleges that [Defendants] violated his First Amendment right to practice his dietary laws and that Defendant[] Garrett violated Plaintiff's Fourteenth Amendment rights to procedural and substantive due process when Garrett removed Plaintiff from the Common Fare Diet for six (6) months in the manner described supra.

(Part. Compl. 9.) The Court directed service of the Particularized Complaint on Defendants.

On December 8, 2015, Defendants filed an Answer and a Motion for Summary Judgment. In response Baines filed a Motion to Amend with a new Proposed

---

[5] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

[6] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

[7] The Court notes that this Final Complaint and all subsequent filings were drafted with assistance from a frequent litigant in this Court, Johnathan Lee X Smith.

Amended/Supplemental Complaint. (ECF No. 50.) By Memorandum Order entered on January 28, 2016, the Court directed Defendants to file a response to the Motion to Amend, the Proposed Amended/Supplemental Complaint, and its impact on the Motion for Summary Judgment. (ECF No. 52, at 2.) The Court subsequently reviewed Baines's Response in Opposition for the Motion for Summary Judgment and found "that [Baines] ha[d] revised portions of his allegations from the Particularized Complaint and provide[d] new evidence." (ECF No. 59, at 1.) Therefore, by Memorandum Order entered on February 16, 2016, the Court also directed a response from Defendants to the Response in Opposition. (*Id.*)

By Memorandum Opinion and Order entered on June 17, 2016, the Court denied without prejudice Defendants' Motion for Summary Judgment and Baines's Motion to Amend, and directed Baines to file a final particularized complaint. The Court explained the following:

> Baines's attempt to amend appears to be nothing more [than] an effort to avoid an adverse summary judgment. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1488 n.20 (2016); *cf. Local 472 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Indus. of U.S. and Canada v. Georgia Power Co.*, 684 F.2d 721, 724–25 (11th Cir. 1982) (denying motion to amend "after all defendants had filed motions for summary judgment" and Plaintiff failed to respond to the Motion for Summary Judgment). The Court views Baines's most recent attempt to amend his complaint as bordering on abusive: Baines's claims cannot be squared with those set forth in his after-filed Response in Opposition to Summary Judgment; Baines's amended pleadings are designed to add new parties and tack on unrelated allegations for claims he should have known about and alleged at the time he filed his Particularized Complaint; the facts alleged are inconsistent with his prior submissions; and, Baines has had multiple opportunities to provide these facts but failed to do so until he filed the Amended Complaint. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1487 & nn.11–12 (2016); *see id.* § 1488 & nn.13 & 20.

(ECF No. 67, at 5–6.) The Court found "it difficult to ascertain exactly what Baines intends to argue, which of the contradictory facts the Court should rely upon, and which Defendants Baines intends to name." (*Id.* at 6.) The Court noted that "Baines's various submissions are wholly inconsistent" and explained that "[n]either the Court nor the Defendants should be required to

3

sort out Baines's claims and the supporting facts in the first instance." (*Id.*) As an indulgence to Baines as a *pro se* plaintiff, the Court permitted Baines to file a final particularized complaint to refine his claims. Baines has filed a Final Complaint.

A review of the Final Complaint reveals that Baines has again altered his claims. Many of his claims provide little more than conclusory statements that his constitutional rights were violated. Moreover, several of his claims are internally inconsistent and difficult to reconcile with each other. While the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it will not act as the inmate's advocate and develop, *sua sponte*, statutory and constitutional claims that the inmate failed to coherently raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). A *pro se* plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action will not do." *Thigpen v. McDonnell*, 273 F. App'x 271, 273 (4th Cir. 2008) (citations omitted) (internal quotation marks omitted). Liberal construction of a *pro se* pleading does not mean that a court should invent facts to remedy an inadequately pled claim. Instead, the "plaintiff remains the master of his complaint and is, in the end, the person responsible for articulating the facts that give rise to a cognizable claim." *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998). Baines has had more than ample opportunity to plead his claims. Accordingly, the Court will not cull through the allegations and supporting facts to create the most promising legal claims for Baines.

## II.   BAINES'S CLAIMS

In his Final Complaint, Baines asserts the following claims for relief:[8]

Claim One:      Defendants "substantially burdened [Baines's] free exercise right by creating pressure on [Baines] to consume food from the Common Fare diet . . . that did not conform to his understanding of his Islamic dietary tenets," in violation of (a) the First Amendment, and (b) RLUIPA. (Final Compl. 6.)

Claim Two:      Defendants "subjected [Baines] to unlawful discrimination on account of his religion in violation of the Equal Protection Clause of the Fourteenth Amendment" by not providing him a Halal diet.[9] (*Id.*)

Claim Three:   Defendants "violated [Baines's] rights under the Common Fare contract . . . ." (*Id.* at 11.)

Claim Four:    Defendants violated Baines's free exercise rights under (a) the First Amendment and (b) RLUIPA, when he was removed from the Common Fare diet. (*Id.* at 19.)

Claim Five:    Defendants violated Baines's "procedural due process rights under the Fourteenth Amendment" when they removed him from the Common Fare diet. (*Id.*)

Claim Six:     Defendants violated Baines's "substantive due process rights under the Fourteenth Amendment" when they removed him from the Common Fare diet. (*Id.*)

Baines seeks a variety of relief scattered throughout the Final Complaint including injunctive and

monetary relief.[10]

_____

[8] The Court corrects the capitalization and punctuation and removes emphasis from Baines's submissions.

[9] Baines desires a diet including Halal meat. Thus, for the purposes of this Memorandum Opinion, the Court defines a Halal diet as a diet that includes Halal meat.

[10] While he does not specify, the Court assumed that Baines brings this action against Defendants in their individual and official capacities. RLUIPA fails to authorize a private cause of action for money damages against state officials in their official or personal capacities. *Sossamon v. Texas*, 563 U.S. 277, 293 (2011) (holding that state officials sued in their official capacities enjoy Eleventh Amendment Immunity against RLUIPA claims for damages); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (concluding that, as an exercise of Congress's spending clause authority, RLUIPA failed to authorize claims for monetary damages

## III.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted).  When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1871)).  "'[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the

---

against state officials in their individual capacities); *see Haight v. Thompson*, 763 F.3d 554, 569–70 (7th Cir. 2014) (concluding that, as an exercise of Congress's authority under the Commerce Clause, RLUIPA failed to authorize claims for monetary damages against state officials in their individual capacities).  Accordingly, Baines's demands for monetary damages with respect to RLUIPA are DISMISSED.  With respect to RLUIPA, only Baines's demand for injunctive relief remains.

*onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does

not impose upon the district court a duty to sift through the record in search of evidence to

support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th

Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see*

Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

As pertinent here, in support of their Motion for Summary Judgment, Defendants rely

upon: (1) an affidavit of Mark Engelke (Mem. Supp. Mot. Summ. J. Attach. 1, ECF No. 81–1

("Engelke Aff."));[11] (2) the VDOC Food Service Manual (*id.* Encl. A); (3) a supplemental

affidavit of Mark Engelke (Mem. Supp. Mot. Summ. J. Attach. 2, ECF No. 81–2 ("Supplemental

Engelke Aff.")); (4) a copy of the Common Fare Menu for April 2015 through March 2016 (*id.*

Encl. A); (5) an affidavit of Anthony Anderson (Mem. Supp. Mot. Summ. J. Attach. 3, ECF No.

81–3 ("Anderson Aff. "); (6) a copy of the Common Fare Diet Attendance Report for the month

of December 2014 (*id.* Encl. A); a supplemental affidavit of Anthony Anderson (Mem. Supp.

Mot. Summ. Attach. 4, ECF No. 81–4 ("Supplemental Anderson Aff."); (7) grievance material

submitted by Baines (*id.* Encl A); (8) an affidavit of Louise Goode, the Assistant Warden at GCC

(Mem. Supp. Mot. Summ. J. Attach. 5, ECF No. 81–5 ("Goode Aff."); (9) VDOC Operating

Procedure § 841.3 (*id.* Encl. A); (10) an Institutional Classification Authority Hearing

Notification Form (*id.* Encl. B); (11) an Institutional Classification Authority Hearing report (*id.*

---

[11] Defendants initially failed to file Mark Engelke's affidavit on the CM/ECF docketing system as ECF No. 81–1, despite labeling the entry as such. The entry was corrected on November 29, 2016. However, the courtesy copy of the Memorandum in Support of Defendants' Motion for Summary Judgment sent to the Court contained the Engelke affidavit, and thus, the Court assumes that the paper copies mailed to Baines were also correct. Even if the paper documents were not correct, Defendants previously filed Engelke's affidavit with their initial Motion for Summary Judgment (*see* ECF No. 45–1), thus, the affidavit was already part of the record.

Encl. C); (12) grievance materials Baines filed in April 2015 (*id.* Encl D); and, (13) grievance materials Baines filed in September and October 2015 (*id.* Encl E.).

At this stage, the Court is tasked with assessing whether Plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. In response, Baines submits: (1) an affidavit of a fellow inmate, Donald Osborne (Resp. Mot. Summ. J. Ex. 1, ECF No. 88–1 ("Osborne Aff.")); (2) some grievance materials (*id.* Encl. A); (3) Baines's own "Declaration to Supplemental Affidavit of Defendant Anthony Anderson" ("Declaration One," ECF No. 89); and, (4) Baines's own "Declaration to Affidavit filed by Defendant Louise G. Goode" ("Declaration Two," ECF No. 90).

Furthermore, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(e). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Summary judgment affidavits must also "set out specific facts." Fed. R. Civ. P. 56(e)(2). Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *see also Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991)).

In his Declarations, Baines makes a number of statements that are of no value in assessing the propriety of summary judgment. The majority of Baines's statements are either

conclusory,[12] do not set forth specific facts, have little to no bearing on the claims alleged in the Final Complaint,[13] or simply admit or deny statements from Defendants' Affidavits.[14]  Thus, Baines's conclusory assertions will not be considered in evaluating the Motion for Summary Judgment.  Moreover, Baines failed to swear to the contents of his Final Complaint under penalty of perjury, thus the allegations contained therein fail to constitute admissible evidence.[15]

In addition, in his Brief in Opposition to Memorandum in Support of Defendants' Motion for Summary Judgment ("Brief in Opposition," ECF No. 88), Baines only identifies as "Genuine Issues in Dispute" matters pertaining to Claims One, Five, and Six.  Because Baines fails to identify any genuine issue of material fact in dispute for Claims Two, Three, and Four, the Court may rely on Defendants' undisputed facts relating to those claims.  *See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").  Nevertheless, in light of Baines's status as a *pro se* plaintiff, the Court will parse Baines's declarations for any factual support for these claims.

In light of the foregoing submissions and principles, the following facts are established with respect to the Motion for Summary Judgment.

---

[12] For example, Baines states that "the hot dogs in question were intentionally served by Anderson." (Decl. One, ¶ 10.)  Such a statement is a mere conclusion, and Baines is not competent to testify about Anderson's intentions.

[13] For example, Baines avers that he can see food services workers preparing his Common Fare Meals and that they are not doing so properly, a claim not alleged in his Final Complaint. (Decl. One ¶¶ 4–8.)

[14] For example, Baines states "I emphatically DENY all averments contained in Paragraph 7" (Decl. Two ¶ 3), or "These are bald lies!" and states that Defendant Goode "should be criminally charged and tried for committing perjury" (*id.* at 3).

[15] Attached to Baines's Complaint is another declaration.  In this declaration, Baines discusses the exhaustion of his administrative remedies, an affirmative defense that Defendants do not raise. (ECF No. 72–1, at 1–3.)

## IV. SUMMARY OF PERTINENT FACTS

### A.    Common Fare Diet

Baines is confined in the GCC and "is a sincere believer in the religion of Islam." (Final Compl. 4.)[16] Baines was received at GCC from Keen Mountain Correctional Center on July 11, 2012. Baines was suspended from the Common Fare diet at Keen Mountain on May 17, 2012, but was approved for reinstatement to the Common Fare diet at GCC on August 31, 2012. (Goode Aff. ¶ 6.)

"The VDOC created the Common Fare diet to meet the religious needs and restrictions of all known religions." (Engelke Aff. ¶ 4.) No pork or pork derivatives are used in the Common Fare diet. (*Id.*) "The Common Fare (CF) menu was designed to specifically meet the religious dietary needs of offenders whose dietary requirements cannot be accommodated with foods provided" by the regular menu ("Master Menu"). (Goode Aff. ¶ 4; Engelke Aff. ¶ 4.) Common Fare is not a vegetarian diet and includes proteins such as Kosher tuna, peanut butter, eggs, and soy-based proteins. (Engelke Aff. ¶ 4.) "Previously, sealed entrees were provided by outside vendors and included different protein sources [but t]hese were . . . removed from the Common Fare menu in 2007." (*Id.*) "The current Common Fare menu has been analyzed and certified as meeting or exceeding minimum daily nutritional requirements." (*Id.*) Islamic leaders have confirmed that the Common Fare diet meets Islamic dietary guidelines. (*Id.* ¶ 5.) The proteins used in the Common Fare diet are Kosher, including Kosher tuna, and "do not contain any pork or pork derivatives, prohibited by the Halal diet." (*Id.*) "The Common Fare menu provides for fresh, uncooked fruits and vegetables, as required by the Halal diet." (*Id.*) Kosher tuna is an acceptable substitute for Halal meats. (*Id.*)

---

[16] While the Complaint contains allegations only and does not constitute evidence, the Court utilizes undisputed allegations from the Complaint when needed to provide a more fulsome summary.

"A diet is considered Halal if it consists of permitted food." (*Id.* ¶ 6.) Pork and blood are forbidden. (*Id.*) "Halal meat is certified for the very specific manner in which the meat is slaughtered and processed." (*Id.*) Engelke avers that he "explored the feasibility of providing offenders with a Halal diet, specifically including Halal meat [which requires specific methods of slaughter, storage, preparation, and serving]," but "found that this would be impractical and cost prohibitive." (*Id.*) "Not including the additional operating costs associated with the provision of a separate Halal diet, . . . a Halal meal would cost approximately 25 to 30 percent more than a [Common Fare] meal . . . due to low demand and few production facilities in the United States." (Supp'l Engelke Aff. ¶ 5.) The Kosher foods the VDOC purchases "are lower in price due to greater demand." (*Id.*) "In addition to the prohibitive cost of purchasing Halal meat on the open market, the VDOC would be burdened with increased costs associated with providing separate storage facilities for the Halal meats, as well as separate cooking areas, designated ovens and separate cooking utensils." (Engelke Aff. ¶ 7.) Engelke explains that the VDOC already has a second kitchen area for the Common Fare diet and the institutions lack space or manpower to provide a third kitchen area specifically for Halal meats. (*Id.*) Presently, providing a Halal diet to VDOC inmates is not economically feasible. (Supp'l Engelke Aff. ¶ 5.)

The VDOC has clear guidelines regarding preparation and service of the Common Fare food items. (Anderson Aff. ¶ 4.) Food service workers, including inmate kitchen workers must be trained and supervised in the proper handling of Common Fare food. (*Id.*) Food Operations Director Anthony Anderson avers that he continually monitors the food preparation and service areas. (*Id.*) The daily cost of the Common Fare diet is higher than the regular diet ranging from $3.29 to $5.19 per inmate compared with $2.10 for the regular diet. (*Id.* ¶ 5.)

## B.   Administration of and Participation in the Common Fare Diet

Because of the increased financial and administrative burden incurred in the provision of the Common Fare diet, "the VDOC has strict guidelines in place to ensure that the offenders receiving [the Common Fare] are participating in the diet because they have a sincere desire to adhere to their religious tenets." (*Id.*) Offenders who wish to receive the Common Fare diet are reviewed to determine whether they hold a sincere religious belief that requires the Common Fare diet instead of the regular diet. (Goode Aff. ¶ 6.) Each participant is required to sign a Common Fare Agreement prior to participating in the Common Fare diet. (*Id.*)

An offender's participation in the Common Fare diet is closely monitored and violations of the rules may result in an offender's suspension or removal. (*Id.* ¶ 7.) Goode explains that:

> Violations include:  failing to pick-up a minimum amount of seventy-five percent of meals served per month; being observed eating, trading or possessing unauthorized food items from the main line; being observed giving away or trading a [Common Fare] food item; purchasing or being observed eating food items from the commissary inconsistent with the dietary restrictions of the [Common Fare] program; and not attending services or other religious activities at least twice per month (if available).

(*Id.*) A violation of the Common Fare Agreement results in a suspension of six months for the first violation, suspension of one year for the second violation, and a suspension of four years for the third violation. (*Id.*) The VDOC has procedures to correctly identify any inmate violating the terms of the special diet agreement, and any GCC staff member observing an inmate committing a violation is required to document the offense with an incident report. (*Id.* ¶ 8.) Violations of the Common Fare Agreement are reported to the Institutional Classification Authority ("ICA") by the food service department. (*Id.*) The Food Operations Director is responsible for the documentation of the provision of Common Fare meals and ensures that the

Common Fare Diet Attendance Log is completed for each meal for offenders receiving the diet.

(*Id.*)

Anderson explains:

> Every Friday, a checklist of approved [Common Fare] participants is downloaded from the VDOC database and printed to be used by the Line Supervisor for the upcoming week, which runs Sunday through Saturday. When an offender comes to pick up his [Common Fare] tray, he hands in his ID card, his name is marked on the checklist, and his ID is handed back to him. At the end of the month, the number of trays picked up by each offender, as logged onto the checklist, is totaled. If an offender did not pick up 75% of his [Common Fare] trays, I forward his name to an Assistant Warden who refers the information to the appropriate Institutional Classification Authority (ICA). The ICA then determines if the offender's failure to pick up his tray(s) is justified, or if he should be recommended for suspension from [the Common Fare].

(Anderson Aff. ¶ 6.) The checklist is provided as a matter of routine to administrative staff for appropriate action. (*Id.* ¶ 7.) Upon notice of a violation of the Common Fare Agreement, the offender is served with a Notice of ICA hearing. (Goode Aff. ¶ 8.)

"The difference in price for providing a [Common Fare] diet to an offender versus a regular diet is a substantial distinction for budget considerations and poses a financial burden on the institution." (*Id.* ¶ 14.) GCC "is required to manage a food budget and deter manipulative behavior." (*Id.*) Without serious and established consequences to eating outside the restrictions of the Common Fare diet, prisoners with no religious interest will ask to participate. (*Id.*)

### C.    Baines's Suspension from the Common Fare Diet

Anderson provides a copy of the Common Fare food tray checklist from GCC for the dates November 30 through January 3, 2014. (Anderson Aff. Encl. A, at 1.) The checklist reflects that Baines picked up only 68 meals of the required 70 during the December 2014 reporting period. (*Id.*) An ICA Hearing Notification form was served on Baines advising him that a hearing was scheduled to take place on or after March 6, 2015. (Goode Aff. ¶ 9; *see id.*

Encl. B, at 1.) By copy of this notice, Baines was informed of his due process rights for the hearing. (Goode Aff. ¶ 9; *see id.* Encl. B, at 1.)

Rodney T. Garrette, former Unit Manager, served as the ICA on March 20, 2015. (Goode Aff. ¶ 10.)[17] Documentation from Food Service indicated that Baines picked up only 68 trays out of the 93 meals served during December 2014. (*Id.*) Because the Common Fare Agreement required that inmates pick up at least 75% of their Common Fare meals, the ICA recommended that Baines be suspended from the Common Fare diet for six months. (*Id.*; *id.* Encl. C, at 1.) Louise Goode, the Assistant Warden at GCC, approved that recommendation on March 20, 2015. (Goode Aff. ¶ 10; *id.* Encl. C, at 1.)

Donald Osborne, an inmate employed in "S2 Food Service," avers that he worked in food service during December 2014. (Osborne Aff. ¶¶ 1–2.) During that time, Osborne was assigned the responsibility to check the Common Fare Attendance sheet for prisoners who received their Common Fare meals. (*Id.* ¶ 2.) Osborne avers that Baines "received all of his Common Fare trays for the month(s) of November-December 2014" and Osborne "personally checked off 'Every' Common Fare tray he received." (*Id.* ¶¶ 3–4.) Osborne states that Baines "did not miss any of his Common Fare meals for December 2014." (*Id.* ¶ 4.)

**D.    Baines's Grievances about His Suspension**

On April 9, 2015, Baines filed a regular grievance alleging procedural due process errors in the ICA decision to suspend him from the Common Fare diet. (Goode Aff. ¶ 11.) Baines

---

[17] A disparity exists in the record about which day the ICA hearing took place and the Court believes that Goode mistakenly stated in her affidavit that the hearing took place on March 9, 2015. (*See* Goode Aff. ¶ 10.) The ICA Classification Authority Hearing form states that the hearing date was scheduled for March 9, 2015; however, further down the form under "Hearing Disposition" it states that the ICA made his recommendation on March 20, 2015. (Goode Aff. Encl C, at 1.) Baines makes much of this disparity and insists that the hearing took place on March 20, 2015. (Decl. Two at 2–3.) This issue of fact is not material for the purposes of summary judgment. Accordingly, the Court utilizes March 20, 2015 for the date of the hearing.

complained that he had not been provided forty-eight hours' notice of the hearing and that he had been denied a desired witness, Ms. Whitehead. (*Id.*) Baines requested to be reinstated on the Common Fare diet. (*Id.* Encl. D, at 1.) On April 22, 2015, Assistant Warden C.M. Parker responded to Baines's grievance and noted that Baines had been served notice that the ICA hearing would be held on or after March 6, 2015, and his hearing was on March 20, 2015; thus, he was provided with forty-eight hours' notice of the hearing. (*Id.* at 4–5.) Parker indicated that Baines's "common fare suspension was based solely on Food Service data which showed [he] failed to pick up the minimum amount of meals for the month of December 2014" and that Baines's "witness was not called because she was not deemed relevant to this hearing; the necessary documentation was available and sufficient." (*Id.* at 4.) Parker found Baines's grievance to be unfounded because no policy violation occurred. (*Id.*)

On September 22, 2015, Baines submitted an informal complaint complaining that his six-month suspension was over and his name had not been added back to the Master pass list which would allow him to receive the Common Fare diet. (Goode Aff. ¶ 13.) C. Hicks responded that Baines needed to address the issue with his institutional counselor. (*Id.* Encl. E, at 3.) On October 23, 2015, Baines submitted a regular grievance complaining that he had not been reinstated to the Common Fare diet. (*Id.* at 1.) On November 6, 2015, Assistant Warden Parker responded that Baines needed to see his counselor so that they could process the necessary paperwork to have him reinstated. (*Id.* at 2.) Baines's grievance was determined to be unfounded because no policy violation occurred. (*Id.*) Baines was reinstated to the Common Fare diet on December 3, 2015. (*See* Mem. Supp. Mot. Summ J. ¶ 15.)[18]

---

[18] While Defendants failed to include the institutional record that demonstrates the exact date Baines was reinstated to the Common Fare diet, the fact that Baines is currently on the Common Fare diet is not in dispute. Indeed, as of May 21, 2016, Baines was clearly receiving

### E.    Baines's Complaint about Hot Dogs

On June 3, 2016, Baines filed a regular grievance complaining that he had received a

non-Kosher or non-Halal hot dog on his Common Fare tray. (Suppl'l Anderson Aff. ¶ 4; *see id.*

Encl. A, at 1.)  Food Operations Director Anderson avers that chicken hot dogs, routinely served

on the regular menu, had been mistakenly served on the Common Fare menu.  (Supp'l Anderson

Aff. ¶ 4.)  Assistant Warden Parker indicated in her response that the warehouse that stocked

Kosher hot dogs was "completely out" and "the Kosher hot dogs [were] not available at this

time."  (*Id.* Encl. A, at 2.)  An investigation also revealed that "the hot dogs that were served to

the regular population and the common fare participants were the same poultry hot dogs.  The

hot dogs were not supposed to be served to common fare participants."  (*Id.*)  Parker found

Baines's grievance to be founded and advised Baines that "staff have been advised to ensure that

policy is adhered to[]."  (*Id.*)

### V.    NO PERSONAL INVOLVEMENT OF CLARKE

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must

[demonstrate] that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Vinnedge v.*

*Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (noting that the doctrine of *respondeat superior* is

inapplicable to § 1983 actions).  "To survive summary judgment, a plaintiff claiming a violation

of § 1983 must produce evidence that the defendant knew of a deprivation and 'approved it,

turned a blind eye to it, failed to remedy it, or in some way personally participated.'"  *Oakley v.*

*Cowan*, 187 F. App'x 635, 638 (7th Cir. 2006) (some internal quotation marks omitted) (quoting

*Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).  "Absent direct participation, there must

---

the Common Fare diet because he complains of hot dogs being served with his Common Fare
tray. (Supp'l Anderson Aff. Encl. A, at 3.)

at least be a showing that the defendants 'acquiesced in some demonstrable way' in the alleged violation." *Id.* (quoting *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003)).

In his Final Complaint, Baines fails to allege facts indicating that Defendant Clarke had any direct involvement or personal responsibility in the alleged deprivation of his rights. Accordingly, the claims against Defendant Clarke will be DISMISSED.

## VI.    RLUIPA AND FREE EXERCISE CLAIMS

### A.    RLUIPA

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
> **(1)** is in furtherance of a compelling governmental interest; and
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).  Thus, to begin, Baines must demonstrate that Defendants' policies impose a "substantial burden" on his religious exercise.  In determining if Baines has met this standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

### B.    Whether the Burdened Activities Are a Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Couch*, 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  Baines's claims implicate one activity—receiving a diet that comports with his Islamic beliefs.  (*See* Final Compl. ¶ 10.)  Baines only suggests in his unsworn Final Complaint that his faith motivates him to "practice dietary laws of Islam" (*id.*) and later avers that requires him to not consume pork.  (Decl. One ¶ 3.)  Given

RLUIPA's broad definition of religious exercise, and the Defendants' failure to address this

portion of the inquiry, the Court assumes these activities constitute religious exercise. *See*

*Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *3 (E.D. Va. Nov.

18, 2011) (assuming inmate's enrollment in seminary course constituted religious exercise for

purposes of RLUIPA).

### C.   Baines Fails to Demonstrate a Substantial Burden on His Religious Exercise

#### 1.   Applicable Law

RLUIPA fails to define the term substantial burden. *See Couch*, 679 F.3d at 200.  The

United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's

jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See*

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).  Thus, the Fourth Circuit has explained that a

substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior and to
> violate his beliefs, or one that forces a person to choose between following the
> precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand,
> and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d

at 187).  In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove

that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*,

496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13

(2005)).  Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA

plaintiff demonstrate that the government's denial of a particular religious . . . observance was

more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278

(11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th

Cir. 2004));[19] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray

---

[19] In *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the denial of additional sacred items simply by the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the "Blot" ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Thus, an inmate failed to demonstrate the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed inmate to study in his cell. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009). Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to

substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876. As explained below, in light of the foregoing principles, Baines fails to demonstrate any substantial burden upon his religious exercise with respect to Claim One (b).

> ### 2.    No Substantial Burden from Receipt of Common Fare Diet (Claim One (b))

In Claim One (b), Baines contends that Defendants "substantially burdened [Baines's] free exercise right by creating pressure on [Baines] to consume food from the Common Fare diet . . . that did not conform to his understanding of his Islamic dietary tenets," in violation of RLUIPA. (Final Compl. 6.) Baines provides no sworn testimony to explain "his understanding of his Islamic dietary tenets," (*id.*) except to aver that he is "forbidden to eat or touch pig meat, commonly referred to as pork." (Decl. One ¶ 3.)[20] With the exception of the prohibition on

---

[20] In his unsworn Final Complaint, Baines alleges, in sum, on the subject:
Plaintiff is strictly enjoined to practice dietary laws of Islam. For example, his dietary tenets require him to consume chicken, beef, and a variety of marine life. The meat must first be slaughtered in the manner prescribed by Plaintiff's Islamic dietary laws before it will be religiously acceptable. Meat slaughtered in this manner is referred to as Halal.
(Final Compl. 4.) To the extent Baines desires Halal meat to be served at GCC, he fails to put forth any *evidence* that his religion *requires* him to eat Halal meat, or that his lack of receipt of Halal meat as part of his diet substantially burdens his religious exercise.
Even if Baines had sworn to these statements, assertions of this ilk fail to create a substantial burden. *See Krieger*, 496 F. App'x at 326 (concluding inmate's "blanket assertion" "that the sacred items were 'necessary' to perform 'well-established rituals'" was insufficient to establish a substantial burden when inmate failed to "identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs"); *see also DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue" (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006))); *Marron v. Jabe*, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n.5 (E.D. Va. Feb. 14, 2014) (citations omitted). Moreover, the undisputed evidence establishes that Baines is served Kosher tuna with the Common Fare diet, an acceptable substitute for Halal meat, which certainly constitutes "marine life." (*See* Englke Aff. ¶ 4; *see* Supp'l Englke Aff. Encl. A, at 1.)

pork, Baines's statements about his religiously desired diet amounts to nothing more than "[a]iry

generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . ."

*United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (alterations in original) (internal

quotation marks omitted) (citation omitted).

Baines fails to demonstrate a substantial burden on his religious exercise. Baines fails to

demonstrate that the VDOC's provision of the Common Fare diet places pressure on him to

violate his religious beliefs or abandon one of the precepts of his religion. *Living Water Church

of God*, 258 F. App'x at 739. First, the undisputed evidence establishes that the Common Fare

diet does not include pork in its menu and that Baines has not been forced to eat pork. In this

regard, the Common Fare diet has not forced Baines to violate his religious mandate to avoid

consuming pork.[21] Second, the undisputed evidence also demonstrates that the Common Fare

diet meets Islamic dietary guidelines as Baines contends he requires. (Engelke Aff. ¶¶ 5–6.)

Thus, Baines fails to put forth any evidence demonstrating that the provision of the Common

Fare diet substantially burdens his religious beliefs. *See Van Wyhe*, 581 F.3d at 656–57.

Accordingly, Claim One (b) will be DISMISSED.[22]

---

[21] For the first time in Declaration One, Baines avers that he can see food service workers sanitizing both the Common Fare diet utensils and the regular menu utensils in the same dishwater. (Decl. One ¶ 8.) Baines raised no such claim relating to this fact in his Final Complaint and the Court will not create a new claim for him. After properly exhausting such a claim, Baines remains free to file a new action raising this claim.

[22] In addition, Baines's allegations reveal an inconsistency in the composition of the diet that Baines desires. In Claim One, he contends that the Common Fare diet fails to meet his religious needs. However, once Baines was removed from the Common Fare diet, Baines sought to be returned to that diet. Thus, it is difficult to ascertain whether the Common Fare diet, as provided, frustrates Baines's ability to eat in accordance with his alleged religious requirements.

### D.    Free Exercise

#### 1.    Receipt of Common Fare Diet (Claim One (a))

Similar to RLUIPA, in order for Baines to survive summary judgment for his First Amendment claim, Baines must demonstrate Defendants' conduct substantially burdens his religious exercise. *Whitehouse*, 2011 WL 5843622, at *5. "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As explained above, Baines has failed to demonstrate a substantial burden on his religious exercise with respect to the allegations in Claim One. Accordingly, Claim One (a) will be DISMISSED.

#### 2.    Removal from the Common Fare Diet (Claim Four (a))

In Claim Four (a), the Court construes Baines to argue that Defendants violated his free exercise rights under the First Amendment when they removed him from the Common Fare diet. Baines indicates that paragraphs 30 through 44 of the Final Complaint support Claim Four (a) as well as Claims Five and Six, his due process claims. (*See* Final Compl. 19.) These paragraphs more appropriately support his claims alleging due process violations under the Fourteenth Amendment, and do not appear to truly allege facts giving raise a free exercise claim. Nevertheless, out of an abundance of caution, the Court reviews Baines's allegations under the guise of the First Amendment Free Exercise Clause.

To establish a violation of the Free Exercise Clause, Baines must demonstrate that "(1) he holds a sincere belief that is religious in nature" and (2) that Defendants imposed a substantial burden on the practice of his religion. *Whitehouse*, 2011 WL 5843622, at *4 (citing *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)). "Government officials impose a substantial burden on the free exercise of religion by 'put[ting] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Massenburg v. Adams*, No. 3:08cv106, 2011 WL 1740150, at *4 (E.D. Va. May 5, 2011) (alteration in original) (quoting *Lovelace*, 472 F.3d at 187 (some internal quotation marks omitted)).

As discussed above, the Court construes Baines to argue that Defendants violated his free exercise rights under the First Amendment when they removed him from the Common Fare diet. Baines's sparse allegations and sworn testimony offer little to nothing to advance this claim. Baines does not challenge the VDOC's policy of removing him from the Common Fare diet for failing to pick up all of his meals, but instead argues that he did, indeed, pick up all of his meals and he should not have been removed or that he was denied certain process before he was removed. Even if Baines had alleged a claim that the VDOC's policy of removing him from the Common Fare diet for failing to pick up the required amount of meals violated his religious beliefs, Baines's claim fails.

As an initial matter, the only sworn testimony Baines proffers about his sincere religious belief is that his religion requires him to not eat or touch pork. (Decl. One ¶ 3.) Assuming that Baines's religious beliefs are sincere, Baines fails to demonstrate that Defendants imposed a substantial burden on his ability to practice his religion. Baines's does not establish that Defendants' actions have put "substantial pressure" on him to "modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187. Baines allegations in support of his free exercise

24

claim are devoid of any specific factual support that would demonstrate that his removal from the Common Fare diet substantially burdens his religious practice.[23] Additionally, Baines remains free to practice all other aspects of his religion, including attending services, partaking in religious observances, and studying religious material. (Goode Aff. ¶ 14.) Baines fails to demonstrate that his temporary removal from the Common Fare diet violates his First Amendment rights. Accordingly, Claim Four (a) will be DISMISSED.

### E.    Baines's Claim for Injunctive Relief in Claim Four (b) is Moot

In Claim Four (b), Baines argues that Defendants violated his free exercise rights under RLUIPA when they removed him from the Common Fare diet. The undisputed evidence demonstrates that Baines was reinstated to the Common Fare diet again on December 3, 2015. (*See* Mem. Supp. Mot. Summ J. ¶ 15.)

"'[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the out-come.'" *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). Thus, "[o]nce an inmate is removed from the environment in which he is subjected to the challenged policy or practice,

---

[23] Baines fails to articulate why he could not eat select foods from the regular menu or, in the alternative, purchase foods from the commissary that comport with Islamic dietary laws. *See e.g.*, *Shabazz v. Johnson*, 3:12CV282, 2015 WL 4068590, at *10 (E.D. Va. July 2, 2015) (no substantial burden exists when an inmate can discard food "at odds with" his religious diet (citing *Muhammad v. Mathena*, No. 7:14–cv–00134, 2015 WL 300363, at *3 (W.D. Va. Jan. 22, 2015))); *see also Smith*, 502 F.3d at 1278 (explaining that a burden that is merely an "inconvenience on religious exercise" is not substantial); *Living Water Church of God*, 258 F. App'x at 739 (no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult").

absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of the claim." *Id.* at 287 (holding transfer or release moots claim for injunctive relief under RLUIPA).[24] Neither Baines, nor the record, establishes ongoing interference with his receipt of the Common Fare diet under RLUIPA. Thus, Baines's RLUIPA claim for injunctive relief is DISMISSED AS MOOT. *See, e.g., Garnica v. Wa. Dep't of Corr.*, 965 F. Supp. 2d 1250, 1271 (W.D. Wash. Aug. 13, 2013) (finding RLUIPA claim "moot as Ramadan 2010 has long since passed").

## VII.   EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment commands that similarly situated persons be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To survive summary judgment, Baines must demonstrate: (1) "that he has been treated differently from others with whom he is similarly situated"; and, (2) that the differing treatment resulted from intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual [evidence] that establish[es] improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (internal quotation marks omitted) (citation omitted).[25] If a plaintiff satisfies the above, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of

---

[24] If Baines demonstrates the action is "'capable of repetition, yet evading review,'" his claim may not be moot. *Incumaa*, 507 F.3d at 289 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)). Nevertheless, such a showing requires a "'demonstrated probability'" that the allegedly improper action "will recur again, and to the same complainant." *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 483 (1982)). That showing is not made here. The record reflects that Baines has been on the Common Fare diet since December 2015.

[25] No evidence exists that Defendants' policies were motivated by an intent or desire to discriminate against Baines because he is a sincere believer of the religion of Islam.

scrutiny." *Morrison*, 239 F.3d at 654 (citations omitted). "In a prison context," disparate

treatment passes muster so long as "the disparate treatment is 'reasonably related to [any]

legitimate penological interests.'" *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (alteration

in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

To evaluate the reasonableness of a prison's policy, courts apply the factors set forth in

*Turner v. Safley*, 482 U.S. 78, 89–92 (1987). *Veney*, 293 F.3d at 732.

> That test asks: (1) whether there is a "valid, rational connection" between the
> prison regulation or action and the interest asserted by the government, or whether
> this interest is "so remote as to render the policy arbitrary or irrational"; (2)
> whether "alternative means of exercising the right ... remain open to prison
> inmates"; (3) what impact the desired accommodation would have on security
> staff, inmates, and the allocation of prison resources; and (4) whether there exist
> any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace*, 472 F.3d at 200). The Court

need not "weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v.*

*Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (citations omitted); *see Veney*, 293 F.3d at 732

(finding three factors applicable); *Lambirth v. Cambra*, 177 F. App'x 691, 691–92 (9th Cir.

2006) (finding only the first factor relevant, and explaining that the inquiry then turns to whether

"the inmate severs that common sense connection"). "The burden, moreover, is not on the State

to prove the validity of prison regulations but on the prisoner to disprove it." *Overton, v.*

*Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted).

In Claim Two, Baines contends that Defendants "subjected [him] to unlawful

discrimination on account of his religion in violation of the Equal Protection Clause of the

Fourteenth Amendment" by not providing him a Halal diet. (Final Compl. 19.) Baines appears

to compare himself to two types of inmates: (1) Muslim inmates in the Federal Bureau of

Prisons receiving a Halal diet; and, (2) inmates in the Buckingham Correctional Center receiving a Nation of Islam diet.

Baines fails to demonstrate that he is similarly situated to inmates in the Federal Bureau of Prisons receiving Halal diets or inmates at Buckingham Correctional Center receiving a Nation of Islam diet. The Equal Protection Clause does not require "things which are different in fact or opinion to be treated in law as though they were the same." *Moss v. Clark*, 886 F.2d 686, 691 (4th Cir. 1989) (quoting *Plyler*, 457 U.S. at 216). Instead, "the class to which [an inmate] belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject." *Id.* (citations omitted). Because Baines fails to demonstrate that he is similarly situated to inmates in Buckingham and in the Federal Bureau of Prisons, this alone forecloses Baines's equal protection claim.

Even if Baines could demonstrate that he and a comparator inmate at Buckingham Correctional Center or the Federal Bureau of Prisons were similarly situated, and that the different treatment was a result of intentional discrimination, his claim nonetheless fails. First, Defendants have demonstrated that the Common Fare diet meets Islamic dietary restrictions. (Engelke Aff. ¶¶ 5–6.) To the extent that Baines contends that other inmates receive Halal meats in addition to their meal, Defendants have proffered sufficient evidence demonstrating that any differential treatment "is reasonably related to . . . legitimate penological interests," *Veney*, 293 F.3d at 732 (internal quotation marks omitted) (citation omitted), that provision of individually tailored diets would be unduly burdensome, *id.*, and no reasonable alternatives exist. *Id.* Halal meals would cost 25% to 30% more than the Common Fare meals, Halal meal items are difficult to procure and are scarce, and maintaining a third kitchen for preparation and storage of Halal meats would be cost prohibitive. (Engelke ¶¶ 6–7; Supp'l Engelke Aff. ¶¶ 5.) In addition to the

28

prohibitive costs, the VDOC lacks space and manpower to provide a third kitchen for Halal meats.

Defendants have demonstrated that the refusal to provide Baines with a Halal diet is reasonably related to the legitimate penological interests of containing cost, managing scarce prison resources, and efficient food provision. *Cf. Baranowski v. Hart*, 486 F.3d 112, 122–23 (5th Cir. 2007) (no equal protection or First Amendment violation because denying inmate Kosher diet reasonably related to the legitimate penological interest of containing cost and running a simplified food program); *DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004) (denying inmate Buddhist diet was reasonably related to the prison's legitimate penological interest in efficient food provision); *Williams v. Morton*, 343 F.3d 212, 217–18 (3d Cir. 2003) (denying inmate Halal meat was reasonably related to the legitimate penological interests of simplified food service, security, and cost control); *Cooper v. Lanham*, No. 97–7183, 1998 WL 230913, at *1–2 (4th Cir. May 7, 1998) (holding that a prison's denial of Kosher meals was reasonably related to the legitimate penological interest of conserving and managing prison resources). Baines fails to proffer any evidence demonstrating that this penological interest is "so remote as to render the policy arbitrary or irrational." *Wall*, 741 F.3d at 499 (citation omitted) (internal quotations marks omitted). Baines fails to demonstrate that Defendants' refusal to provide him with a Halal diet violates his right to equal protection. Accordingly, Claim Two will be DISMISSED.

## VIII.   DUE PROCESS CLAIMS

### A.   Procedural Due Process Claim

The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569

(1972). Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected interest. *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997) (citations omitted). A liberty interest may arise from the Constitution itself, or from state laws and policies. *See Wilkinson v. Austin*, 545 U.S. 209, 220–21 (2005).

Demonstrating the existence of a state-created liberty interest requires a "two-part analysis." *Prieto v. Clarke*, 780 F.3d 245, 249 & n.3 (4th Cir. 2015) (quoting *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000)). First, a plaintiff must make a threshold showing that the deprivation imposed amounts to an "atypical and significant hardship . . . in relation to the incidents of ordinary prison life." *Sandin*, 515 U.S. at 484. Second, Baines must then identify the state regulatory or statutory language that creates a protected liberty interest in remaining on the Common Fare diet. *See Puranda v. Johnson*, No. 3:08CV687, 2009 WL 3175629, at *2 (E.D. Va. Sept. 30, 2009) (citation omitted).

In Claim Five, Baines argues that Defendants violated his "procedural due process rights under the Fourteenth Amendment" when they removed him from the Common Fare diet. (Final Compl. 19.) Defendants concede that Baines has a liberty interest in eating a religious diet based on his First Amendment right to free exercise.[26] *See Hammer v. Keeling*, No. 1:14CV8 (JCC/MSN), 2015 WL 925880, at *8 (E.D. Va. Mar. 3, 2015). Neither the parties, nor courts in the Fourth Circuit have clearly defined what process the Constitution requires prior to removing

---

[26] Contrary to this concession, courts in the Fourth Circuit, including the Fourth Circuit itself, have found that an inmate's six-month suspension from the Common Fare diet does not pose "atypical and significant hardship . . . in relation to the incidents of ordinary prison life" *Sandin*, 515 U.S. at 484, and therefore, no liberty interest arises. *See Hoye v. Clarke*, No. 7:14CV00124, 2015 WL 3407609, at *7 (W.D. Va. May 27, 2015), *aff'd* 628 F. App'x 199 (4th Cir. 2016); *Awe v. Va. Dep't of Corr.*, No. 7:12-CV-000546, 2013 WL 5988869, at *3 (W.D. Va. Nov. 12, 2013), *aff'd* 564 F. App'x 54 (4th Cir. 2014). Much like the inmates in the cited cases, Baines fails to demonstrate that he was permanently removed from the Common Fare or deprived of his ability to practice his religion in other ways during the temporary six-month suspension. *See Hoye*, 2015 WL 3407609, at *7; *Awe*, 2013 WL 5988869, at *3 n.8.

an inmate from a religious diet. In the context of vested good conduct credit, where a liberty

interest arises, the Due Process Clause entitles an inmate to the following process prior to

revoking vested credit:

> (1) an impartial tribunal; (2) written notice of the charges prior to the hearing; (3) an opportunity to call witnesses and present documentary evidence; (4) aid from a fellow inmate or staff representative if the issues are complex; and (5) a written statement by the fact finder describing the evidence relied upon and the reasons for taking disciplinary action.

*Coor v. Stansberry*, No. 3:08CV61, 2008 WL 8289490, at *2 (E.D. Va. Dec. 31, 2008) (citing

*Wolff v. McDonnell*, 418 U.S. 539, 563–71 (1974)). Surely, in this diet context, the Constitution

requires no more process than the deprivation in *Wolff* that "inevitably affects[ed] the duration of

[an inmate's] sentence." *Sandin*, 515 U.S. at 487.[27]

    As discussed below, Baines received all process that was due prior to his removal from

the Common Fare diet.

### 1.    VDOC's Process Related to Common Fare Diet

    Baines was suspended from the Common Fare diet for violating the criteria outlined in

the Common Fare Agreement he signed in order to participate in the program. Each participant

is required to sign a Common Fare Agreement prior to beginning the Common Fare diet.

(Goode Aff. ¶ 6.) An offender's participation in the Common Fare diet is closely monitored and

violations of the rules may result in an offender's suspension or removal. (*Id.* ¶ 7.) An inmate

---

[27] In *Wilkinson*, the Supreme Court explained that an inmate must demonstrate that the process employed by the state was constitutionally inadequate and that the examining court should assess the sufficiency of a particular process using the framework in *Matthews v. Eldridge*, 424 U.S. 319 (1976). *See Wilkinson*, 545 U.S. at 220, 224–25. The Supreme Court has set forth the process that the Due Process Clause requires when a deprivation impacts a fairly substantial liberty interest in vested good conduct credit. *See Wolff*, 418 U.S. at 563–71. As discussed further in Part VIII.A.2, Baines was afforded all process that the Constitution requires prior to his removal from the Common Fare diet. Thus, he fails to demonstrate that the process employed was constitutionally inadequate.

must pick up a minimum amount of seventy-five percent of the meals served per month or they will be removed from the diet. (*Id.*) Sanctions for violations of the Common Fare Agreement are provided for in the VDOC Operating Procedure 841.3. (*Id.*) Pursuant to that procedure, an inmate's first violation of the Common Fare Agreement results in a six-month suspension from the program. (*Id.*) The VDOC has procedures to correctly identify any inmate violating the terms of the special diet agreement and any GCC staff member observing an inmate committing a violation is required to document the offense with an incident report. (*Id.* ¶ 8.) A list of Common Fare participants is maintained and when the inmate picks up his Common Fare meal he hands his identification card to kitchen staff who then check him off of the list. (Anderson Aff. ¶ 6.) Violations of the Common Fare Agreement are reported to the ICA by the food service department. (*Id.*) The Food Operations Director is responsible for the documentation of the provision of Common Fare meals and ensures that the Common Fare Diet Attendance Log is completed for each meal for offenders receiving the diet. (*Id.*)

A copy of the Common Fare food tray checklist from GCC for the dates November 30 through January 3, 2014 reflects that Baines picked up only 68 meals of the required 70 during the December 2014 reporting period. (Anderson Aff. Encl. A, at 1.) An ICA Hearing Notification form was served on Baines advising him that a hearing was scheduled to take place on or after March 6, 2015. (Goode Aff. ¶ 9; *see id.* Encl. B, at 1.) By copy of this notice, Baines was informed of his due process rights for the hearing, including that he was permitted to be present at the hearing, has a right to remain silent, has a right to know the reason for any decision rendered by the ICA, has the right to have a counselor or an employee present to assist him, and has a right to receive a copy of the written findings and recommendations. (Goode Aff. Encl. B, at 1.)

32

Baines's ICA Hearing took place on March 20, 2015, and documentation from Food

Service indicated that Baines picked up only 68 trays out of the 93 meals served during

December 2014.  (Goode Aff. ¶ 10.)  Because the Common Fare Agreement required that

inmates pick up at least 75% of their Common Fare meals, the ICA recommended Baines's

suspension from the Common Fare diet for six months.  (*Id.*; *id.* Encl. C, at 1.)  Louise Goode,

the Assistant Warden at GCC approved that recommendation on March 20, 2015.  (*Id.* ¶ 10; *id.*

Encl. C, at 1.)

Baines then utilized the grievance process because he believed the report of the violation

was erroneous.  He filed an informal complaint and a grievance.  Such procedures permit "an

inmate to protest a wrongful removal immediately and have th[e] matter investigated as soon as

possible."  *Blount v. Ray*, No. 7:08CV00504, 2009 WL 2151331, at *6 (W.D. Va. July 17, 2009).

### 2.   Baines's Specific Due Process Allegations

Baines contends that Defendants violated his procedural due process right because: (1)

the Defendants knew or should have known that the report that Baines only picked up 68 meals

was false (Final Compl. ¶¶ 39–40); (2) that he was not permitted to call Defendant Whitehead as

a witness at the hearing (*id* ¶ 40); (3) that he was not provided with a timely Notification of

Referral (*id.* ¶ 41); (4) the reporting officer was not present at the hearing and he submitted no

notarized statement (*id.*); and, (5) despite Baines's repeated requests between September and

December 2015, Defendants "ignored" his requests to be reinstated to the Common Fare diet (*id.*

¶ 44).

Baines initially claims that Defendants knew or should have known that the report that

Baines only picked up 68 meals was false.  However, the record fails to demonstrate that Baines

made this argument during his disciplinary proceeding.[28]  To the contrary, the ICA Hearing

Disposition form indicates that Baines made no statement in his defense during the ICA Hearing.

(Goode Aff. Encl. C, at 1.)  Moreover, at no time in his grievances pertaining to his removal

from the Common Fare diet did Baines complain that he had actually picked up the required

amount of Common Fare trays and should not have been removed from the Common Fare diet.

Baines now submits an affidavit of Mr. Osborne, an inmate food service worker, who avers that

Baines picked up *all* of his Common Fare meals during the month of December 2014.  (Osborne

Aff. ¶ 3.)  Baines obtained this affidavit from Osborne in December 2015, nine months after his

suspension from the Common Fare diet.  Significantly, Baines himself never swears that he

picked up all of his meals, much less seventy-five percent of his meals, and should not have been

removed from the diet.  Baines fails to demonstrate that Defendants knew or should have known

that that the report that Baines only picked up 68 meals was false.  Thus, Baines's first due

process challenge fails.

Moreover, to the extent that Baines's suggests that the evidence was insufficient to

support his conviction, the Supreme Court has held "the relevant question is whether there is any

evidence in the record that could support the conclusion reached by the disciplinary board."

*Superintendent Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455–56 (1985) (citations

omitted).  As reflected above, there was substantial evidence to support the hearing officer's

decision that Baines had not picked up the requisite amount of Common Fare trays and therefore,

was in violation of the Common Fare agreement.

---

[28] In his unsworn Final Complaint, Baines alleges that he "emphatically denied the report that he picked [up] only 68 of 70 of his Common Fare food trays during the month of December 2014."  (Final Compl. ¶ 41.)  Baines offers no sworn testimony that he informed Defendants during the disciplinary proceeding that he picked up the requisite amount of trays.

Second, Baines contends that his due process rights were violated because he was not permitted to call Defendant Whitehead as a witness at the hearing. "Inmates have a due process right to call witnesses at their disciplinary hearings when doing so would be consistent with institutional . . . correctional goals, *Wolff*, 418 U.S. at 566, . . . , but there is no right to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary, *Forbes v. Trigg*, 976 F.2d 308, 317–18 (7th Cir. 1992)." *Piggie v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003). Baines alleges that "Whitehead's testimony and evidence were needed by Plaintiff to establish that . . . . Defendants improperly allowed prisoners who worked in the Food Service Department to track the number of trays he picks up; and that said prisoners frequently did not keep accurate records for the number of Common Fare food trays he and other prisoners had picked up between December 2014 and March 2015." (Final Compl. ¶ 40.) Baines also claims: "Whitehead's testimony was also needed because she was in actual or constructive possession of Mr. Osborne's Common Fare weekly attendance sheet . . . ." (*Id.*)

Baines indicates that he requested that Defendant Whitehead be available as a witness at his ICA hearing. Staff informed Baines that his requested witness had not responded to his request and that Baines was informed of this fact several days prior to the hearing, and that the witness "was not deemed relevant to the hearing" because "the necessary documentation was available and sufficient." (Goode Encl. D, at 7.) First, Baines fails to put forth any evidence that Defendant Whitehead would have provided favorable testimony for his defense. Second, Baines himself could have testified that the prisoners who worked in food service maintained inaccurate records and that he had picked up all of his trays. Thus, Baines fails to demonstrate that the decision made by staff that Defendant Whitehead's testimony was unnecessary or repetitive

violated his due process rights. *See Piggie*, 344 F.3d at 677 (citing *Forbes*, 976 F.2d at 317–18.) Thus, Baines second due process challenge fails.

Baines's third challenge—that he was not provided with a timely Notification of Referral—is belied by the record. After the hearing, Baines complained through the grievance procedure that he was not provided forty-eight hours' notice of the hearing and that his requested witness was not present. (Goode Aff. Encl D, at 7.) GCC staff explained that he received the requisite forty-eight hours of his ICA Hearing because he was served with the ICA Hearing Notification form on March 6, 2015 and his hearing was held on March 20, 2015. (*Id.* at 4, 7.)

In his fourth challenge, Baines argues that his due process rights were violated because the reporting officer was not present at the hearing and he submitted no notarized statement. (Final Compl. ¶ 41.) However, due process does not require live testimony. *Coor*, 2008 WL 8289490, at *3 (citations omitted). The record reflects that the evidence presented at the hearing showed that Baines had not picked up the requisite amount of Common Fare trays. Baines fails to advance any argument as to how the reporting officer's live testimony or statement would have affected the result of the disciplinary hearing. *See Chesson v. Jaquez*, 986 F.2d 363, 366 (10th Cir. 1993). As previously discussed, "some evidence" existed that Baines failed to pick up the requisite amount of Common Fare trays, and thus, the requirements of due process were satisfied. *See Coor*, 2008 WL 8289490, at *3 (citations omitted).

Finally, Baines contends that his due process rights were violated when, despite Baines's repeated requests between September and December 2015, Defendants "ignored" his requests to be reinstated to the Common Fare diet. (Final Compl. ¶ 44). Baines fails to demonstrate that Defendants ignored his requests. The Operating Procedures governing the Common Fare Agreement clearly indicate that at the end of the six-month suspension, an inmate "may submit a

written request to the Facility Unit Head or designee to be reinstated after the penalty period has expired." (Goode Aff. Encl. A, at 8.) On September 22, 2015, Baines submitted an informal complaint complaining that his six-month suspension was over and his name had not been added back to the Master pass list which would allow him to receive the Common Fare diet. (Goode Aff. ¶ 13.) C. Hicks responded that Baines needed to address the issue with his institutional counselor. (*Id.* Encl. E, at 3.) On October 23, 2015, Baines submitted a regular grievance complaining that he had not been reinstated to the Common Fare diet. (*Id.* at 1.) On November 6, 2015, Assistant Warden Parker responded that Baines needed to see his counselor so that they could process the necessary paperwork to have him reinstated. (*Id.* at 2.) Baines's grievance was determined to be unfounded because no policy violation occurred. (*Id.*) Baines, apparently eventually contacted his counselor and was reinstated to the Common Fare diet in December 2015.

Baines fails to demonstrate that Defendants denied him due process with regard to his request to be reinstated. Instead, Defendants responded to Baines more than once that Baines needed to meet with his counselor to be reinstated. Accordingly, Claim Five will be DISMISSED.

## B.    Substantive Due Process Claim

The government runs afoul of substantive due process only when its actions shock the conscience. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998); *Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001). The United States Court of Appeals for the Fourth Circuit has emphasized that the protections of substantive due process extend only to "state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of

adequate rectification by any post-deprivation state remedies." *Rucker v. Harford Cty.*, 946 F.2d 278, 281 (4th Cir. 1991) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). To shock the conscience, "the conduct must be 'intended to injure in some way *unjustifiable by any government interest.*'" *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (quoting *Lewis*, 523 U.S. at 849).

In Claim Six, the Court construes Baines to argue that Defendants violated his "substantive due process rights under the Fourteenth Amendment" when they removed him from the Common Fare diet. (Final Compl. 19.) The allegations in support of this claim are the same paragraphs identified as supporting his First Amendment and procedural due process claim. Construing his arguments liberally, the Court reads Baines to argue that his removal from the Common Fare diet either infringes on his First Amendment rights or his procedural due process rights. Baines cannot assert a substantive due process claim based on his claim that his removal from the Common Fare diet infringes on his religious beliefs because the explicit text of the First Amendment protects Baines's free exercise rights. *See Lewis*, 523 U.S. at 842 ("[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more general notion of substantive due process, must be the guide for analyzing these claims." (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (Rehnquist, C.J.) (plurality opinion))). As previously explained, Baines fails to establish that Defendants violated his First Amendment free exercise rights. Accordingly, Claim Six will be DISMISSED.

## IX.   STATE LAW CLAIM (BREACH OF CONTRACT)

In Claim Three, Baines alleges that Defendants "violated [Baines's] rights under the Common Fare contract . . . ." (Final Compl. 11.) In support of his claim, he avers that

Defendant Natarcha released a memorandum that informed inmates that Halal hot dogs were now included on the Common Fare menu. (Decl. One ¶ 9.) He also faults Defendants for serving him a non-kosher or Halal hot dog on his Common Fare tray. (Final Compl. ¶ 24; *see* Supp'l Anderson Aff. ¶ 4; *see id.* Encl. A, at 1.) Food Operations Director Anderson avers that chicken hot dogs, routinely served on the regular menu, had been mistakenly served on the Common Fare menu. (Supp'l Anderson Aff. ¶ 4.) Assistant Warden Parker indicated in her response that the warehouse that stocked Kosher hot dogs "was completely out" and "the Kosher hot dogs [were] not available at this time." (*See id.* Encl. A, at 2.)

The Court construes Baines to argue that Defendants breached a "contract" when they failed to provide him with Halal hot dogs per the memorandum and served him a regular hot dog on this one occasion. Generally, supplementary state law claims should be dismissed if the federal claims are dismissed before trial. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). However, Baines's claim clearly lacks merit, so the Court exercises discretion to retain Baines's breach of contract claim.

"Under Virginia law, '[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 761 (E.D. Va. 2005) (alteration in original) (quoting *Filak v. George*, 594 S.E.2d 610 (Va. 2004)). To survive summary judgment, Baines must demonstrate each element set forth above. Baines's claim lacks merit because he first fails to demonstrate the existence of a contract between himself and the Defendants. Baines fails to demonstrate, and this Court fails to discern, how the memorandum announcing that Halal hot dogs would be served amounted to a contract between Baines and

Defendants.  Moreover, even if the Common Fare Agreement was a contract, which Baines has

failed to establish, Baines also fails to offer any facts indicating that his receipt of a hot dog with

his meal on one occasion somehow amounted to a breach or that he suffered injury from

receiving this hot dog.  Baines's breach of contract claim lacks merit, and Claim Three will be

DISMISSED.

## X.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 80)

will be GRANTED.  Baines's Motion for Summary Judgment (ECF No. 87) will be DENIED.

The action will be DISMISSED.

An appropriate Order shall accompany this Memorandum Opinion.

Date: December 19, 2016
Richmond, Virginia

/s/
James R. Spencer
Senior U. S. District Judge